UNITED STATES of America, Plaintiff,

v.

Pedro R. GARCIA, Defendant.

Cr. A. No. 94–10048–01.

United States District Court,
D. Kansas.

Aug. 17, 1994.

Steven K. Woodring, Law Office of Steven K. Woodring, Wichita, KS, for defendant.

Brent I. Anderson, Office of U.S. Atty., Wichita, KS, for plaintiff.

### MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on defendant Pedro R. Garcia's motion to suppress statements (Doc. 10) and motion to suppress evidence (Doc. 11). The court held a hearing on defendant's motions on June 29, 1994, and an interpreter was provided for the defendant, whose primary language is Spanish. The court ordered a transcript of that hearing (Doc. 17, referred to herein as "Tr."), and directed the parties to submit memorandums in support of their respective positions on the suppression issues (Docs. 19 and 20).

### FACTUAL BACKGROUND

Many of the facts pertinent to defendant's motions to suppress are in dispute. The court will do its best to give a specific ac-

count, highlighting the controversies and conflicting testimony along the way.

On the early afternoon of April 6, 1994, agents for the Drug Enforcement Administration Task Force were at the residence of Victor Salome, 1207 El Monte, Wichita, Kansas. Mr. Salome had just been arrested on a warrant and removed from the house. He had refused to consent to a search, and some of the agents had gone to the United States Attorney's Office to try to obtain a telephonic search warrant from Judge Theis. Other agents remained at the house waiting for the search warrant to arrive.

At approximately 2:15 p.m., the agents remaining at Salome's house observed the defendant, Pedro Garcia, drive his vehicle into Salome's driveway, park, exit the vehicle, and start walking towards Salome's house.[1] Detective Shawn Fortune and detective Johnnie Green, who is fluent in Spanish, approached the defendant. Speaking in English, detective Fortune identified himself and detective Green and told the defendant why they were there. According to the detectives, Fortune asked defendant for some identification, and defendant gave Fortune his driver's license. Fortune noted the pertinent information on the license, and claims that he gave the license back to the defendant. Fortune asked the defendant if he knew who lived at the Salome residence, and defendant answered that "he was familiar with him" and was in fact there to "visit Victor." (Tr. 8, 45).

Fortune next asked the defendant if he was carrying any guns, large amounts of money, or drugs on his person. Defendant indicated he was not. According to the detectives, Fortune then requested permission to do a pat down search on the defendant, and detective Green repeated the request in Spanish, indicating that they would be searching for drugs, money, and guns. (Tr. 46, 68, 74–75). Green also asked if he could search defendant's car. The detectives maintain that defendant consented to both searches.

The pat down search of defendant proved to be fruitful. Detective Green retrieved $1,942.00 in cash from defendant's left rear pants pocket and also found a piece of paper with Mr. Salome's cellular telephone number on it. Green handed the money to Fortune and, while Green began searching defendant's car, officer Fortune inquired about the money.

According to both detectives (Fortune asking the questions and Green listening while searching the car), defendant offered three seemingly distinct explanations for the $1,942.00 in his pocket. First, defendant indicated the money was for his attorney, whose name he could not remember but whose office was near Central and Market streets in Wichita. (Tr. 10–11, 48). Defendant next stated that the money had been lost in a Western Union wire transfer and that his attorney had recovered it for him. (Tr. 11, 48). Finally, defendant claimed to have just withdrawn the money from a bank, though he could not produce any bank receipt. (Tr. 48). Fortune pressed defendant on these explanations. At this point, defendant expressed difficulty speaking and understanding English, and detective Green then took over the questioning in Spanish. Fortune and Green ultimately decided to confiscate the $1,942.00 and gave defendant a DEA receipt.

Defendant disputes many parts of the detectives' accounts. According to the defendant, neither detective asked for identification or for permission to search his person. (Tr. 115, 123–24).[2] Rather, the detectives simply approached him, asked if he knew that drugs were sold at the Salome residence, told him to raise his arms, and immediately began searching his person, at which time they found the $1,942.00. According to defendant, he gave only one explanation for the money: He withdrew the money from a credit union, attempted to send it to his

---

1. There is some dispute as to whether and, if so, how far defendant got out of his car before the detectives confronted him. (Tr. 124–25). The court does not view this dispute as material to the matters now at issue.

It should be noted that the agents did not know of or have any reason to suspect the defendant prior to observing him at Mr. Salome's house.

2. Defendant admits that he did consent to a search of his car.

sister in Mexico via Western Union, the money was somehow lost during transfer, defendant's attorney helped him recover the money, and defendant was on his way to his attorney's office to pay his attorney's fee. (Tr. 135–38).

Both Fortune and Green claim that when they first confronted the defendant, they asked about his citizenship and whether he had an alien registration or "green card." (Actually, detective Green claims that he asked defendant whether he had a "mica," a slang reference to a green card). According to the detectives, defendant said he was a resident alien, but he did not have his green card with him. When agents with the Immigration and Naturalization Service (INS) arrived at the scene with the search warrant for Salome's house, they spoke with Fortune and Green, questioned the defendant about his green card, and placed defendant under arrest.

Defendant's account of his arrest is much different. According to the defendant, neither Fortune nor Green ever asked about his green card. Instead, Fortune and Green held onto his driver's license, instructed him not to move, and told other officers to "watch him." Defendant claims he did not feel free to leave. (Tr. 119, 138–40). Defendant further claims the detectives requested permission to search his house and that he refused, telling the officers "that they had already had [him] there for too long for nothing." (Tr. 119). He acknowledges that, when the INS arrived, they did ask to see his green card and that he did not have one in his possession.

At 3:45 p.m., after defendant had been arrested and taken to the police station, detectives Fortune and Green and two uniformed police officers went to defendant's residence. One of the uniformed officers stayed outside in a marked police unit, while Fortune, Green, and the other officer knocked on the door. Defendant's wife, Maria Garcia, answered.[3] Fortune identified himself, Green, and the police officer and asked if they could come in and chat. Mrs.

Garcia allowed them to enter. Fortune noticed Mrs. Garcia's child sleeping on a lounge chair and asked if anyone else was in the house. Mrs. Garcia indicated there was no one else and permitted the officers to conduct a quick protective sweep. Mrs. Garcia and the officers then sat down around the kitchen table and began discussing her husband's situation.

Fortune told Mrs. Garcia about the encounter with her husband at the Salome residence. Mrs. Garcia stated that her husband should have been at work and could not explain why her husband would be carrying nearly $2,000 in cash. Fortune asked to see defendant's green card, and Mrs. Garcia retrieved it for them. Fortune asked if there were any drugs or large amounts of money on the premises, and Mrs. Garcia claimed "there was nothing like that in the residence." (Tr. 18). Fortune then requested that Mrs. Garcia sign a consent form giving them permission to search her home. (Tr. Exhibit M–1). Mrs. Garcia stated that her husband would be home soon, but Fortune told her that her husband was being held awaiting their search. Fortune then read the consent form to Mrs. Garcia and asked if she had any questions. Mrs. Garcia eventually signed the form. She was never specifically informed that she had the right not to consent to the search.

Having obtained Mrs. Garcia's consent, the officers conducted a thorough search and, in the basement, found six pounds of marijuana, scales, baggies, razor blades with cocaine residue on them, approximately $3,800.00 in U.S. currency, and a variety of firearms and ammunition. Meanwhile, defendant was being held at the DEA office and agents had discovered cocaine on his person. When Detective Green arrived, he was asked to read defendant his Miranda rights in Spanish, and defendant asked to speak with a lawyer. (Tr. 35, 94). No more questions were asked at that time. The INS/green card charges were dropped and, despite the items found on defendant's person and at defendant's

---

**3.** Mrs. Garcia speaks English quite well and did not have any difficulty communicating with the detectives.

house, defendant was released without being charged with any other crimes.

On April 14, 1994, a week after defendant's release from jail, detective Fortune called defendant's home, spoke with Mrs. Garcia, and asked if he could come over and talk with the defendant. Mrs. Garcia expressed concern about whether her husband was going to be arrested, but Fortune assured her that no arrest would be made. Mrs. Garcia told Fortune that her husband had left work early in order to meet with an attorney. According to Mrs. Garcia, Fortune stated: "Well, if he sees an attorney we can no longer work with him." (Tr. 108).

Accompanied by another officer, detective Mullikan, Fortune went to the Garcia home and began questioning the defendant. No *Miranda* warnings were given. Fortune asked about the drugs, paraphernalia, guns and money found in defendant's home and about defendant's relationship with Salome. Defendant allegedly confessed that he had obtained the marijuana found in his basement on a front from Salome and had planned to sell it. Defendant further confessed that he had obtained the guns in his basement by trading marijuana with a local gang known as the Vato Loco Boys or VLBs. Finally, defendant admitted that he was intending to pay Salome when he went to Salome's residence on April 6. Fortune told defendant he would be facing criminal charges and prison time and encouraged defendant to agree to testify against Salome. Defendant expressed reluctance, stating that he thought he should first confer with his attorney and Mr. Salome. Fortune told the defendant to call when he decided what to do.

## *DISCUSSION*

Defendant's motions to suppress address each of the three encounters described above and seek the suppression of all evidence and statements as the fruits of an unlawful search and seizure of his person at the Salome residence on April 6, 1994. (Tr. 143, 147). Second, defendant seeks suppression of the evidence found at his house on April 6 on grounds that his wife's consent was involuntary and otherwise invalid. (Tr. 144, 147–52). Third and finally, defendant seeks sup-

pression of the statements he made to the detectives at his home on April 14, 1994 because they were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (Tr. 152–53).

### *Search and Detention of Defendant at the Salome Residence*

■ Defendant contends that the detection and search of his person at the Salome residence violated the Fourth Amendment prohibition against unreasonable searches and seizures. Defendant argues that the detectives' testimony concerning his alleged consent to a pat down search is not credible and that detective Green's search went beyond the scope of pat down search. Furthermore, defendant claims that the detectives' detention of him at Salome's house constituted an unlawful seizure of his person without any reasonable suspicion that he was involved in criminal activity.

■ The Tenth Circuit has identified three categories of police/citizen encounters: (1) voluntary cooperation in response to non-coercive questioning; (2) investigatory or *Terry*-type stop; and (3) arrest. *United States v. Muldrow*, 19 F.3d 1332, 1335 (10th Cir.1994) (citing *United States v. Cooper*, 733 F.3d 1360, 1363 (10th Cir.), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984)). The present case would appear to fall within the second category: an investigatory stop. Such a stop is a "seizure" within the meaning of the Fourth Amendment, but need not be supported by probable cause. *Id.* Rather, in order to justify an investigatory stop, an officer "need have only specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime." *Id.* If an investigatory or *Terry*-stop is warranted, an officer is "entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968).

Having listened to the testimony at the suppression hearing and carefully read over the transcript of that testimony, the court finds that the initial detention of defendant at the Salome residence fell appropriately within the bounds of a unique type of investigatory or *Terry*-stop that occurs when an individual enters an area that is about to be searched. The detectives had secured the home of a suspected drug distributor and were awaiting a search warrant. When the defendant pulled into the driveway, the detectives acted reasonably in approaching him and making inquiry. *See Patterson,* 885 F.2d 483, 484–85 (8th Cir.1989) (recognizing that an individual's approaching a structure that is being searched and is suspected of housing a drug operation may necessitate that police approach the individual and take action to ensure their own protection). The detectives then obtained defendant's consent to do a pat down of defendant's person specifically searching for drugs, guns, and money.[4] The search and subsequent seizure of the $1,942.00 from defendant's pants pocket fell within the scope of the consent obtained. Once the money was discovered (in addition to the piece of paper with Salome's phone number on it) the detectives clearly had reason to suspect that defendant was there to buy drugs from Salome, justifying their further questioning and detention of defendant.

Defendant contends that the search conducted by detective Green did not fall within the scope of a *Terry*-stop, arguing that Green "could not have reasonably believed the wad of paper in Defendant's left rear pocket was a weapon." (Doc. 2 Ariz. 415, 19, p. 4). Detective Green was not asked about what he "believed" when he noticed the bulge in defendant's pocket, and the court will not speculate on that point. In the absence of a finding that the detectives specifically obtained defendant's permission to search his person for drugs, weapons, and money, defendant would therefore probably have a cogent argument. The Supreme Court has recently reiterated that *Terry*-stop frisks are to be strictly limited to a search for weapons and, furthermore, that unless it is "immediately apparent" to an officer that a lump or bulge felt during a pat down is contraband, the officer cannot remove the object from the suspect's clothing. *Minnesota v. Dickerson,* — U.S. ——, ——, 113 S.Ct. 2130, 2138–39, 124 L.Ed.2d 334 (1993). The court's finding of consent to a pat down that included a search for large amounts of money, however, obviates consideration of this issue.

Defendant also argues that the detectives' detention went beyond what was necessary and was not supported by a reasonable and articulable suspicion of criminal activity as required by *Terry.* The court disagrees. As discussed *supra,* the detectives initially had reasonable cause to approach the defendant. Having done so, it was perfectly reasonable for the detectives to ask the defendant if he was carrying any drugs, guns or money and to seek his consent to a pat down search for those items. This led to the immediate discovery of the $1,942.00 on defendant's person, as well as the piece of paper with Salome's phone number on it, raising a "reasonable and articulable suspicion" that defendant, who had said he was not carrying any large amounts of money, was at Salome's residence to purchase drugs. The detectives then questioned defendant, giving him every opportunity to dispel their suspicions, but he could not do so. The officers were thus confronted with the following set of facts: (1) the defendant had just pulled into the driveway of Salome, a suspected drug distributor; (2) he had admitted he was there to see Salome; (3) when asked whether he had any large amounts of money, he had lied;[5] (4) he seemed unable to offer consistent explanations for why he was carrying so much cash;[6]

---

4. Having had the opportunity to actually view the witnesses while they testified at the suppression hearing, the court finds the detective's testimony with respect to consent to search during the initial detention more credible than that of the defendant.

5. The court rejects defendant's argument that the search was not within the scope of the consent given because $1,942.00 is not a "large sum of money." In Wichita, Kansas, $1,942.00 in cash is a large sum of money to be carrying on one's person.

6. Defendant argues that the "record is clear that what detective Fortune interpreted as three separate transactions [with respect to the $1,942.00] was, in fact, one entirely consistent truth." (Doc. 19, p. 6). The court disagrees. Defendant

and (5) he offered no explanation as to why he had brought the money with him to Salome's house, other than to say he was there to "visit Victor." Cumulatively, these five factors were enough to raise substantial suspicions and allow the detectives to explore whether defendant was involved with Salome's drug trafficking. Hence, in the court's view, the initial detention of the defendant and the seizure of the $1,942.00 was "reasonable under the circumstances." *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993). The court is unpersuaded by defendant's reliance on *United States v. Recalde,* 761 F.2d 1448 (10th Cir.1985), *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988), and *United States v. Ward,* 961 F.2d 1526 (10th Cir.1992).

### Search of Defendant's Residence

Defendant asserts two bases for suppression of the evidence found in the basement of his house. First, he contends his wife's consent to search was not **voluntary.** Second, he contends his wife's consent was not **effective** because defendant himself was available to give his consent and had himself already specifically refused to do so.

The **voluntariness** and **effectiveness** issues raised by defendant are similar to those addressed in a relatively recent Tenth Circuit case, *United States v. Iribe,* 11 F.3d 1553 (10th Cir.1993). In that case, Mr. Iribe was picked up on an arrest warrant, handcuffed, and taken to a home where he had previously been observed. Mr. Iribe adamantly denied that he lived at the residence. Upon arrival at the home, officers encountered a Ms. Lopez who told them that she lived there alone. The officers then presented Ms. Lopez with a consent to search form and read and explained it to her in Spanish, Ms. Lopez's primary language. Ms. Lopez signed the form.

The officers proceeded with their search and discovered men's clothing and weapons in a back bedroom of the house. When confronted with these articles, Ms. Lopez confessed that the items belonged to Mr. Iribe, her uncle, and that he too lived in the house. Mr. Iribe then also admitted that he lived at the residence, and the officers sought and obtained Mr. Iribe's consent to search as well. The search ultimately yielded a large amount of cash and some weapons.

Mr. Iribe was charged in federal court with several drug and firearms violations. Upon a motion to suppress, the district court ruled that the search of the house violated the Fourth Amendment because neither Mr. Iribe nor Ms. Lopez voluntarily consented. The government appealed, and the Tenth Circuit reversed, finding clear error in the district court's voluntariness determination with respect to Ms. Lopez. In so holding, the court set forth and applied standards for analyzing voluntariness and third-party consent issues similar to those raised by defendant herein.

With respect to **voluntariness,** the Tenth Circuit stated:

> "The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue." *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993). "[T]he government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given."

Applying these standards, the court concluded that Ms. Lopez had voluntarily and intelligently given her consent to a search of her and Mr. Iribe's home.

The officers knocked on the door and Ms. Lopez voluntarily allowed them to enter the house. Although Mr. Iribe was in handcuffs, the record does not reveal that

---

admits that Fortune did not understand his story very well because of the partial language barrier between himself and detective Fortune. (Tr. 117). Detective Green, who speaks Spanish fluently, overheard the conversation and testified that it was not until Fortune started to press Garcia about the source of the money that defendant said "I need somebody, you know, who speaks Spanish." (Tr. 93). Based upon the entirety of the testimony regarding defendant's explanation about the money, the court finds that defendant's explanation at the scene of the search was not clear and that, under all the circumstances, the officers were justified in detaining him for further questioning.

Ms. Lopez felt coerced, frightened or otherwise threatened. The conversation between [the detective] and Ms. Lopez was cordial and spoken in low volume. No promises or threats were made in an attempt to extract her consent.

In the present case, as in *Iribe,* the government has shown that the detectives' attempts to gain Mrs. Garcia's consent were not coercive or threatening. Indeed, it would appear that the detectives and Mrs. Garcia sat down around her kitchen table and had a very civil conversation about whether she would give her consent to search. The detectives did not offer her any deals or make any threats. Rather, Mrs. Garcia appears to have been allowed to intelligently weigh her options and make her decision. She was certainly capable of doing so. During her testimony at the suppression hearing, Mrs. Garcia manifested no difficulty in understanding counsel's questions, the meaning of the consent form, and the ramifications in signing it. The consent form itself stated that "I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY" and "I FREELY CONSENT TO THIS SEARCH." (Ex. M–1).

■ Defendant points to four factors which he asserts show that his wife was coerced: (1) the officers misrepresented to Mrs. Garcia that her husband was involved with Mr. Salome; (2) the officers failed to advise Mrs. Garcia of her right to refuse to consent; (3) there were three officers in the home, crowding around Mrs. Garcia's kitchen table and interposing themselves between her and her son; and (4) defendant was in custody and unavailable to consult with Mrs. Garcia at the time. The court puts little weight in any of these. Altogether, the circumstances in the present case appear far less disturbing than those in *Iribe,* where **five** officers crowded around Ms. Lopez, Ms. Lopez could not speak English, and there were significant indications that Ms. Lopez was predisposed towards acquiescing to police and other authorities. Admittedly, the consent form used in the present case is different from the one used in *Iribe,* which contained a "clause discussing the right to refuse consent." 11 F.3d at 1555. However,

whether a **defendant** is informed that he need not consent to a search is only one factor to be considered in determining whether the consent was voluntary. *United States v. Sanchez–Valderuten,* 11 F.3d 985, 990 (10th Cir.1993). Here, Mrs. Garcia was not a "defendant" and was not being detained or interrogated as a suspect. Mrs. Garcia claims she was frightened: "I was more frightened than anything and I did sign." (Tr. 112). But anyone faced with the situation that confronted Mrs. Garcia—being informed that your husband had been arrested and that police suspected he was keeping drugs, guns, and money in your home—would reasonably be expected to be somewhat afraid. That alone is not enough to negate her consent. The court had the opportunity to observe Mrs. Garcia during her testimony, and she appeared to be an intelligent, articulate woman. Despite her claims of fear, the totality of Mrs. Garcia's testimony, as well as that of the detectives, convinces the court that her consent was not coerced and that she acted freely and intelligently when she signed the consent form.

With respect to defendant's alternative argument concerning the **effectiveness** of his wife's consent to search, the Tenth Circuit in *Iribe* stated:

"Someone other than the subject of the search may give effective consent if she has a sufficient relationship to the property searched." *United States v. McAlpine,* 919 F.2d 1461, 1463 (10th Cir.1990). "The government bears the burden of proving by a preponderance of the evidence that the consenter had mutual use of the property searched by virtue of her joint access to it, or control for most purposes over it." *Id.* Here, Ms. Lopez clearly had joint access to the house inasmuch as she was living with Mr. Iribe. . . . She therefore was in a position to give effective consent to the search of the house.

Mr. Iribe nevertheless contends that the warrantless search of the house was unlawful because he never gave his consent. The police officers, however, did not need Mr. Iribe's consent to search the house. At the time the officers commenced the search of the house, they were not certain

that Mr. Iribe was in a position to give effective consent to the search because they were not positive that Mr. Iribe even lived there—he adamantly denied [it] .... The officers therefore were justified in relying on Ms. Lopez' consent to the search, provided that her consent was voluntarily given.

*Id.* at 1557.

Clearly, the third-party consent issue raised by defendant in the present case is substantially different from that raised in *Iribe.* Although Mrs. Garcia, like Ms. Lopez, was in a position to give effective consent, the detectives in this case knew that defendant lived in the residence to be searched. Defendant contends that, under these circumstances, the detectives were required to either obtain consent from defendant himself or obtain a search warrant from a judge.

The Supreme Court's guiding light with respect to third-party consent to search is its decision in *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). In that case, police arrested the defendant in his front yard and then sought admittance into his home from a joint occupant. 415 U.S. at 166, 94 S.Ct. at 990–91. The police did not ask the defendant for his consent to search. *Id.* The Supreme Court held the joint occupant's consent to search was effective and sufficient, reasoning that the joint occupant had common authority over the premises and could permit the search "in [her] own right" and that the defendant had "assumed the risk" that the joint occupant might, in his absence, give her consent to a search. *Id.* at 169–71 & n. 7, 94 S.Ct. at 992–93 & n. 7. The Court stated: "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 170, 94 S.Ct. at 993.

Defendant attempts to distinguish *Matlock* from the present case. First, he claims *Matlock* leaves unanswered the question of whether police can obtain consent to search from a third-party when the defendant himself is in their custody and available to give or refuse consent on his own. (Doc. 19, p. 10). Clearly, however, the defendant in *Mat-*

*lock* **was available,** and the Supreme Court did not find that the officers were required to seek his consent. Rather, the Court found the joint occupant had her own right to consent to a search of the premises and that the defendant had assumed the risk that she might exercise that right while he was away from the residence.

■ Defendant also attempts to distinguish *Matlock* by looking to cases in which a defendant was present and objecting to a search at the time that consent was being sought from the joint occupant. (Doc. 19, pp. 10–11) (quoting Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.3(d), pp. 251–52 (2d ed. 1987)). However, while defendant may have objected to the search of his home—he testifies that he did—the evidence is clear that defendant was not **present** at his residence when his wife consented to the search. This case would accordingly appear to fall within the analysis outlined in *Matlock,* discussing an **absent** defendant, not the analysis of those cases where the defendant was actually at the residence and objecting to the search while it was taking place. In any event, this court simply holds, in accordance with other federal courts, that when an arrestee refuses to consent to a search of his residence, police officers are not precluded from going to that residence and attempting to obtain consent to search from other occupants. *See United States v. Childs,* 944 F.2d 491 (9th Cir.1991) (holding that voluntary consent of joint occupant justifies warrantless search of residence even if suspect is physically present and whether or not suspect consents); *United States v. Bethea,* 598 F.2d 331, 335 (4th Cir.), *cert. denied,* 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979) (holding that consent of joint occupant was sufficient and that officers did not have to seek suspect's consent even though he was present at the residence); *United States v. Sumlin,* 567 F.2d 684, 687–88 (6th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978) (holding that defendant's refusal to consent to search did not preclude joint occupant from giving her consent because defendant's refusal did not lessen the risk that he had assumed in living with a co-occupant). To hold otherwise

would be to offend the rationale underlying *Matlock*—that each joint occupant has his own right to consent to a search and that each assumes the risk that a fellow occupant will exercise that right.

Accordingly, the court finds that the items discovered during the search of defendant's residence were properly seized.

*Questioning at Defendant's Residence*

■ Defendant contends that the statements he gave to detectives Fortune and Mullikan on April 14, 1994 at his residence were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and should therefore be suppressed. He claims his invocation of his right to counsel after being mirandized at the DEA office on April 6, 1994 was not scrupulously honored, as required by *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), and characterizes the detectives' questioning of him on April 14 as "re-initiate[d] interrogation." (Doc. 19, pp. 18–19).

The government maintains that defendant's right to counsel no longer attached after the green card charge upon which he was arrested was dropped and defendant was released. The government further argues that *Miranda* is not applicable to the questioning on April 14 because defendant was not in police custody.

"*Miranda* requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir.1993) (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612). Hence, in order for *Miranda* to apply, defendant must have been in "custody" on April 14 and the questioning of the detectives must have constituted "interrogation."

■ A person is in "custody" when he "'has been deprived of his freedom of action in any significant way.'" *Id.* This depends on all of the circumstances surrounding the questioning and how a reasonable man in the suspect's position would have understood his situation. *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993). The "ultimate inquiry" is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, —— U.S. ——, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994).

In the present case, defendant has not presented evidence that a reasonable man in his position on April 14, 1994 would have felt that his freedom of action and movement was being deprived. The only consideration suggesting deprivation of freedom is testimony that, during the questioning, Fortune encouraged defendant to consider cooperating with the police in the investigation of Salome and told defendant that he could expect to be charged with crimes and eventually go to prison. The Supreme Court has recently stated in that regard:

> [A]n officer's views concerning the nature of an interrogation, or beliefs concerning the culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officers' views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

*Stansbury*, —— U.S. at ——, 114 S.Ct. at 1530. Accordingly, detective Fortune's disclosure of his belief that defendant would be charged with criminal violations may be significant in determining whether defendant was in "custody" in the present case. However, as the Supreme Court cautiously indicated, it is only "one among many factors" to be considered. All of the other circumstances must likewise be taken into account. *Id.* at ——, 114 S.Ct. at 1530 ("[I]t is the objective surroundings ... that control the *Miranda* custody inquiry"). Looking to all of the "objective surroundings" in the present case, there is no reason to believe that the prospect of future arrest and imprisonment disclosed by detective Fortune left defendant with the impression, at that particular time, that he was not free to leave or to make his own decisions. Defendant was in

his own house, and Fortune had promised that he would not be arrested. Fortune did not threaten or coerce the defendant and made it quite clear that defendant had to decide for himself whether to cooperate and testify against Salome. Given these circumstances, there was no reason for defendant to believe that his freedom was being restrained to a degree that could possibly be associated with that of a formal arrest.

As to defendant's right to counsel claim, the Sixth Amendment right to counsel arises only after the initiation of formal adversary criminal proceedings against the defendant, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *see also Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986); *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984). The right applies only to pending charges and not to "other and different charges against the same defendant." *Hoffa v. United States,* 385 U.S. 293, 308, 87 S.Ct. 408, 416, 17 L.Ed.2d 374 (1966). Hence, where no charges have been filed or remain pending regarding the subject of interrogation, the Sixth Amendment right to counsel simply does not attach, and defendant's incriminating statements may be used against him. *See Illinois v. Perkins,* 496 U.S. 292, 299, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *Maine v. Moulton,* 474 U.S. 159, 180 n. 16, 106 S.Ct. 477, 489 n. 16, 88 L.Ed.2d 481 (1985). For example, in *United States v. Skipworth,* 697 F.2d 281, 284 (10th Cir.1983), the Tenth Circuit held that the right to counsel did not attach to a federal investigation after related charges in state court had been dismissed.

Based on these authorities, the court finds that no right to counsel attached to the questioning of defendant on April 14 because the INS charges against the defendant had been dropped and, in any event, the questions posed by the detectives did not pertain to those charges. Accordingly, defendant's incriminating statements made to the detectives will not be suppressed.

**IT IS ACCORDINGLY ORDERED** that defendant's motions to suppress (Docs. 10 & 11) are hereby denied.