967 A.2d 915 (2009)
406 N.J. Super. 361
STATE of New Jersey, Plaintiff-Respondent,
v.
Issac LENIN, Defendant-Appellant.
DOCKET NO. A-6499-03T4.
Superior Court of New Jersey, Appellate Division.
Submitted March 11, 2009.
Decided April 7, 2009.
*918 Yvonne Smith Segars, Public Defender, attorney for appellant (Ruth Bove Carlucci, Assistant Deputy Public Defender, of counsel and on the brief).
Bruce J. Kaplan, Middlesex County Prosecutor, attorney for respondent (Simon Louis Rosenbach, Assistant Prosecutor, of counsel and on the brief).
Before Judges AXELRAD, PARRILLO and MESSANO.
The opinion of the court was delivered by
PARRILLO, J.A.D.
In 1997, two separate juries were unable to reach a verdict as to defendant Issac Lenin's guilt of the murder with which he was charged. In 2002, after new evidence was received from a confidential informant, defendant was re-indicted on charges of first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b). This time, a jury convicted him of all three offenses.
*919 Defendant now appeals, arguing that statements of his, recorded by a confidential informant, violated his constitutional right to counsel; that an FBI agent's "behavioral assessment" lacked sufficient scientific reliability to justify admission; that a police officer's testimony concerning defendant's guilt and credibility denied him his right to a fair trial; and that the prosecutor's improper remarks in opening and summation denied him a fair trial. For the following reasons, we affirm.
At around 10:30 a.m. on Monday, April 24, 1995, Deborah Fowler was found dead in the basement of a vacant home at 343 Townsend Street in New Brunswick, where defendant occasionally slept on a mattress. Her face was bloody and battered so badly that the police officers could not even determine the victim's gender. The blood was still wet in places, including where it had splashed on the wall behind her head.
It was later determined that the victim suffered a broken jaw and nose and numerous blunt force injuries to the head, face and neck. She had also been manually strangled. The blunt force trauma injuries were consistent with a ball peen hammer, discovered later that afternoon with human blood on it in the backyard of an abutting property, inasmuch as its semi-circular shape matched the curved lacerations on Fowler's face. Cause of death was a combination of manual strangulation and blunt force trauma. It was believed the homicide took place where the victim was found, because blood on her body showed gravitational draining. Time of death was estimated to be thirty-six to forty-eight hours before discovery of the body. The autopsy also revealed high levels of alcohol, cocaine and morphine in the victim's system, ingested no more than four hours before her death. Fowler did not display any defensive wounds.
In the days preceding her death, Fowler was seen in the vicinity of 343 Townsend Street, in the company of defendant, who worked construction. On Friday evening, April 1, 1995, Ernest Wilson, a fellow construction worker, accompanied defendant and Fowler to his girlfriend's apartment where the four ingested cocaine and drank beer. When, thereafter, Wilson refused to allow defendant to use the bathroom to have sex with Fowler, defendant complained, "If she don't give me none, I'm going to take it." Out of defendant's hearing, Fowler told Wilson's girlfriend, Tracy Lyles, that she was going to get defendant's money and that "he wants some but I'm not going to give him none." Defendant and Fowler left the apartment around 10:00 p.m., at Lyles' request. Lyles recalled defendant wearing a tool belt that night with a ball peen hammer, which, according to Wilson, defendant also carried in his belt at work.
Sometime in April 1995, Israel Lopez saw defendant bring a mattress into 343 Townsend Street, and, late one Friday night in April, observed defendant with a "dark-skinned lady" whom he later identified as Fowler from a photograph. On Friday, April 21, at about 10:30 p.m., Luis Dastas, who lived across the street from 342 Townsend, saw defendant go into the house with a black woman.[1]
Michael Rodriguez, a sixteen-year old drug dealer who worked the French/Townsend *920 Street area, knew Fowler for many years and described her "like an aunt." On Saturday, April 22, at around 6:30 p.m., he sold her a $20 bag of cocaine on Townsend Street, after which she walked down the street toward the railroad bridge. Rodriguez next saw Fowler at 8:30 p.m., coming from the same direction with defendant. She bought another $20 bag of cocaine while defendant stood a few feet away. At 10:30 p.m., he sold her a third $20 bag of cocaine, but defendant was not with her at the time.
Earlier that day, Eddie Warren saw defendant near a liquor store, carrying a ball peen hammer on a belt. Later that evening, around 8:00 p.m., Warren was on his way to see his girlfriend when he saw Fowler and defendant near the railroad tracks. Fowler asked Warren for a cigarette, but defendant remained under the railroad bridge, about eight or nine feet from the two.
Not long afterwards, according to the medical examiner's estimated time of death, defendant, by his own admission years later, struck Fowler repeatedly with a hammer, because she pushed him in the face and tried to take his wallet. Although, at the time, he denied any involvement in the homicide or even knowing the victim, defendant was actually the first to report finding the dead body. On the Monday following Fowler's death, April 24, 1995, at about 9:00 a.m., defendant walked into a neighborhood liquor store, reported that he had just discovered the body of a dead woman when he entered the house at 343 Townsend Street to use a bathroom, and asked someone to call the police. An elderly man volunteered, using a pay phone at a nearby bakery, and the police responded.
Later that afternoon, New Brunswick police interviewed defendant, who repeated his account of discovering the body when he entered the house to use a bathroom, but emphatically denied ever having been in the house before. The house was indeed abandoned with no working plumbing. However, just a few days earlier, in applying for financial assistance from the City of New Brunswick, defendant reported to a social worker that he lived in an abandoned house on Townsend Street.
Months later, on August 23, 1995, after discovering discrepancies in the statements of defendant and other witnesses, Sergeant Ronald Kushner and Orlando Roman from the Middlesex County Prosecutor's Office interviewed defendant. He denied knowing Fowler and, again, denied being inside 343 Townsend Street before April 24. Roman then confronted defendant with information (from witnesses Ernest Wilson and Tracy Lyles) placing him with Fowler on the evening of the homicide or the night before, buying her cigarettes and trying to have sexual relations with her. Defendant denied these reports, but eventually admitted seeing Fowler at Lyles' house, but insisting she remained behind after he left. When asked the location of his other hammer, defendant denied having one. Defendant was arrested that same day for Fowler's murder.
The investigation remained open even after two juries in 1997 could not reach a verdict. Years later, on December 5, 2001, Kushner received a call from Detective Michael McHale of the Sarasota, Florida Police Department, who reported that one of his confidential informants, Pedro Dominguez, had information about the Fowler murder from defendant, when the two were together at the county jail. Specifically, defendant had told Dominguez in Spanish that "[defendant] had killed a girl here on Townsend [Street] in [New] Brunswick, that he had hit her on the head *921 with a hammer in the forehead."[2] Defendant also told Dominguez that he had discarded the hammer, but that police officers had found it, and that the site of the murder was a vacant house. Finally, defendant told Dominguez that he had entered a store to report a dead woman, that somebody telephoned the police department, and that police officers answered the call.
As a result, Kushner and another investigator traveled to Florida on January 21, 2002, to meet McHale and Dominguez, a Cuban national who, at the time, was in federal custody awaiting deportation proceedings. After the officers interviewed Dominguez, arrangements were made to transfer Dominguez to the state prison where defendant was incarcerated. Once the two men were reunited, Dominguez was fitted with an electronic transmitter, in the hope of capturing incriminating information on tape. Eventually, their conversations generated hours of dialogue including one in which defendant disclosed how he murdered Fowler. Specifically, defendant related that Fowler took his wallet and would not return it, so "Man, I let her have it. I let her have it and you know how it happened." Defendant continued, "She was found dead. I don't even want to tell the story."

(I)
Defendant's principal contention is that his surreptitiously recorded statements to the State's undercover informant were in violation of his Sixth Amendment right to counsel, as recognized in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). We disagree and hold that the right to counsel does not survive dismissal of formal criminal charges against the accused, absent collusion or chicanery on the part of the prosecution.
The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const., Amend. VI. The purpose of this right is "to enable the defendant to confront the prosecution and to ensure the integrity of the judicial process." State v. Sanchez, 129 N.J. 261, 265, 609 A.2d 400 (1992). The right to counsel attaches at the pretrial stages and is "triggered when `adversary judicial proceedings have been initiated.'" Ibid. (quoting Kirby v. Illinois, 406 U.S. 682, 688-89, 92 S.Ct. 1877, 1881-82, 32 L.Ed.2d 411, 417 (1972)). "Adversary judicial proceedings" begin by way of "formal charge, preliminary hearing, indictment, information, or arraignment." Kirby, supra, 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417.
In Massiah, supra, a defendant had been indicted, had retained a lawyer, and had been released on bail. Id. at 201, 84 S.Ct. at 1200, 12 L.Ed.2d at 248. While he was free on bail, a federal agent surreptitiously listened to incriminating statements made by defendant. Ibid. Over the defendant's objection, evidence of the statements was introduced against him at trial. Ibid. The Court held that eliciting the statements "after [defendant] had been indicted and in the absence of his counsel" violated the Sixth Amendment. Id. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250; see also United States v. Henry, 447 U.S. 264, 265, 100 S.Ct. 2183, 2184, 65 L.Ed.2d 115, 119 (1980); Maine v. Moulton, 474 U.S. 159, 161, 106 S.Ct. 477, 479, 88 L.Ed.2d 481, 486 (1985).
*922 Unlike those cases where an indictment was pending when the incriminating statements were elicited, ibid., here, the judge dismissed defendant's murder indictment without prejudice on January 23, 1998, after defendant was tried twice on that and related charges in 1997 without conviction. Defendant was not reindicted until February 13, 2002, shortly after he was recorded making incriminating statements. Although no New Jersey case has addressed the right to counsel in this precise situation, other jurisdictions considering the issue have uniformly rejected defendant's position.
In United States v. Mapp, 170 F.3d 328, 333 (2d Cir.1999), cert. denied sub. nom Moore v. United States, 528 U.S. 901, 120 S.Ct. 315, 145 L.Ed.2d 200 (1999), the defendant, Moore, was in a state prison on charges unrelated to the case on appeal. Shortly thereafter, he was charged by the state with murder; however, that charge was dismissed at the state's request, due to evidentiary and speedy trial problems. Ibid. While Moore was still in state prison, federal prosecutors obtained a writ authorizing Moore's transfer to a courthouse to take fingerprints. Ibid. As part of that transfer, Moore was intentionally placed in a holding cell with Sainsbury, a man authorities suspected was also tied to the murder, and who was then cooperating with authorities. Ibid. Moore did, indeed, make incriminating statements about the murder and other crimes, with which he was charged by federal authorities. Ibid.
On appeal of the resulting federal convictions, Moore argued that, in arranging for the meeting with Sainsbury, the state and federal authorities had improperly colluded to deprive him of his Sixth Amendment right to counsel. Ibid. The court disagreed, ibid., holding that the Sixth Amendment right to counsel does not attach until a prosecution has commenced. Id. at 334. Moreover, the Sixth Amendment is "offense-specific," meaning that it does not prohibit the questioning of an individual regarding other crimes that have not been charged. Ibid. The federal prosecution of Moore was not commenced until six months after his conversation with Sainsbury, and, thus, his right to counsel to defend those charges had not yet attached. Ibid.
Nevertheless, Moore argued that, because state and federal officials created a "seamless web of incarceration and prosecution," the right to counsel that attached upon the filing of the state murder charges survived the dismissal of those charges and prevented questioning outside the presence of counsel. Ibid. Yet the district court had conducted a thorough hearing on the extent of the federal and state collaboration in the dismissal of the state case and the initiation of the federal case, and found no collusion. Ibid. Consequently, the court found no violation of Moore's Sixth Amendment right to counsel. Ibid.
In a case similar to Mapp, in United States v. Montgomery, 262 F.3d 233, 245 (4th Cir.), cert. denied, 534 U.S. 1034, 122 S.Ct. 576, 151 L.Ed.2d 448 (2001), the defendant Holland was charged in state court with murder. State authorities nol prossed the charges several months later. Ibid. The nol pross was not an acquittal or a pardon of the murder and did not preclude a prosecution for the same offense. Id. at 246. A year later, three years prior to any charges being initiated, federal authorities taped an incriminating conversation Holland had with an informant. Id. at 245-46. Holland argued that since he "still faced jeopardy" after the state nol prossed the state murder charge, his Sixth Amendment right to counsel had never been extinguished. Id. at 246.
The Fourth Circuit held that "[a]doption of this argument would provide a once-indicted *923 defendant with a permanent constitutional shield[,]" and that "[n]either the Sixth Amendment nor the Supreme Court's explication of the rights guaranteed by it countenance such a result." Ibid. The court continued: "When an indictment is dismissed (or nol prossed) and a defendant discharged, the respective positions of the government and defendant undergo a most important changethey cease to be adversarial. Thus, after dismissal of the state murder charge, Holland no longer faced an `expert adversary.'" Ibid. Consequently, Holland's Sixth Amendment right to counsel was not denied. Id. at 246-47.
Recently, the Eleventh Circuit joined in finding that conversations recorded by federal authorities after the same state charges were dismissed did not violate the defendant's Sixth Amendment rights. United States v. Toepfer, 2008 WL 2673878 at *1, 2008 U.S.App. LEXIS 14811 at *3-4 (11th Cir. July 9, 2008). Similarly, the district court of Kansas held, "[W]here no charges have been filed or remain pending regarding the subject of interrogation, the Sixth Amendment right to counsel simply does not attach, and defendant's incriminating statements may be used against him." United States v. Garcia, 861 F.Supp. 996, 1006 (D.Kan.1994), aff'd, 69 F.3d 549 (10th Cir.1995).
We fail to see the significance of the distinction defendant draws in Mapp and its progeny, namely that the questioning of the individuals in those cases occurred in circumstances in which the right to counsel had not yet attached. In Mapp, when the statements were taken, the state charges against the defendant had been dismissed, and no federal charges had been filed. Here, when defendant's statements were taken, the state charges had been dismissed, and there had been no re-indictment by the State. If plaintiff is placing significance on the duality of state-federal prosecutions, he fails to explain the difference, or why it should matter. The fact remains that when defendant was in jail in Florida on unrelated charges, no charges were pending against him for the Fowler murder.
Other courts have addressed similar issues where there was no federal/state distinction. In United States v. Bartelho, 129 F.3d 663, 675 (1st Cir.1997), cert. denied, 525 U.S. 905, 119 S.Ct. 241, 142 L.Ed.2d 198 (1998), the defendant was charged with robbery in July 1994, and the charges were dropped in October 1994. In March 1995, while the defendant was incarcerated on other charges, he made statements to a fellow inmate, who was a government informant. Id. at 674-75. The defendant was re-indicted on the same charges in May 1995. Id. at 675. The defendant maintained that the government deliberately dismissed the robbery charges against him before he was incarcerated with the informant, thus orchestrating an opportunity to obtain information at a time when he would not have a right to counsel. Ibid. The court stated that "[d]eliberate chicanery by the government intended to subvert an accused's Sixth Amendment rights, by delaying formal charges, may give rise to a right to counsel before charges are brought." Ibid. However, because the trial judge found no manipulation, the court held that the defendant's Sixth Amendment rights were not violated. Ibid.
In Lindsey v. United States, 911 A.2d 824, 827 (D.C.2006), cert. denied, ___ U.S. ___, 128 S.Ct. 804, 169 L.Ed.2d 607 (2007), the defendant was charged with murder in 1992, but, after several months, the government dismissed the charges against him. In 1994, he was incarcerated on drug charges. Ibid. In 1997, while the defendant was still in prison, federal agents *924 visited him and told him that they had new evidence relating to the murder and that they believed he was involved. Id. at 828. The defendant confessed, and several months later he was arrested and indicted for the murder. Ibid. He claimed, on appeal, that his Sixth Amendment right to counsel had been violated, but the court disagreed because judicial proceedings were not pending against him when he was questioned. Id. at 834. The court disagreed with the defendant's contention that his Sixth Amendment right to counsel survived the dismissal of a previous prosecution and held that it must be reasserted "in the absence of bad faith by the government." Id. at 834, 836.
In a case most similar to the present matter, the defendant in State v. Perry, 204 W.Va. 625, 515 S.E.2d 582, 584 (1999), was charged with arson. After the preliminary hearing, the magistrate dismissed the case for lack of sufficient evidence to support the charges. Ibid. The State maintained that after the charges were dismissed, the investigation remained open, but was not actively pursued. Ibid. Two years later, authorities obtained a confession from a co-conspirator, who agreed to wear a wire while speaking to the defendant. Ibid. The defendant made incriminating statements, and he was charged with the same offenses that previously had been dismissed. Ibid. The defendant argued that his right to counsel attached in 1995, when he had first been charged. Ibid. The court disagreed, holding that
unless a criminal defendant can show that the government has obtained a dismissal of adversarial judicial criminal proceedings against him or her in order to circumvent his or her constitutional rights, once such criminal proceedings have been dismissed, the right to the assistance of counsel granted by the Sixth Amendment ... no longer applies.
[Id. at 592.]
The dismissal of an indictment without prejudice cannot be considered a "mere formality" and is not without significance, as defendant posits in seeking to extend his right to counsel permanently, beyond its expiration. On the contrary, "[t]he return of an indictment transforms the relationship between the State and the defendant." Sanchez, supra, 129 N.J. at 276, 609 A.2d 400. In State v. Tucker, 265 N.J.Super. 296, 319, 626 A.2d 1105 (App. Div.1993), aff'd, 137 N.J. 259, 645 A.2d 111 (1994), cert. denied, 513 U.S. 1090, 115 S.Ct. 751, 130 L.Ed.2d 651 (1995), we held that the Sixth Amendment right to counsel attached only "at or after the time that adversary judicial proceedings have been initiated against the defendant." Citing Kirby, supra, 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417, in defining the initiation of adversary judicial proceedings as one initiated by "formal charge, preliminary hearing, indictment, information or arraignment[,]" Tucker, supra, 265 N.J.Super. at 320, 626 A.2d 1105, we determined that the right to counsel in New Jersey is triggered by the return of the indictment. Id. at 325, 626 A.2d 1105. We also held that the Sixth Amendment right "cannot be invoked once for all future prosecutions." Id. at 322, 626 A.2d 1105 (quoting McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166 (1991)); see also State v. Harris, 181 N.J. 391, 435, 859 A.2d 364 (2004), cert. denied sub nom. Harris v. New Jersey, 545 U.S. 1145, 125 S.Ct. 2973, 162 L.Ed.2d 898 (2005).
Here, the dismissal of defendant's murder indictment without prejudice, after successive mistrials and without any prospects of developing additional evidence, was entirely proper. State v. Abbati, 99 N.J. 418, 437, 493 A.2d 513 *925 (1985). Unforeseen and unexpectedly, that additional evidence surfaced four years later in the fortuitous circumstance of defendant being confined with and befriending a confidential informant in a Florida county jail. No indictment was pending at the time the informant was wired, and there is no evidence that law enforcement authorities orchestrated the circumstances, colluded with each other, or engaged in chicanery to circumvent defendant's Sixth Amendment rights. Nor is the evidence suspecible of any suggestion that the State engineered the dismissal of the original indictment to allow its investigation to continue while defendant was not represented. Absent such proof, we conclude that there was no right to counsel once defendant's murder indictment was dismissed, and his surreptitiously recorded statements thereafter were properly admitted in his 2004 trial on the newly indicted murder charge.

(II)
Defendant next contends that the admission of the State expert's behavioral assessment testimony was error. We agree, but find it harmless under the circumstances.
In its in limine motion, the State proffered the testimony of special FBI agent Mark Safarik, who conducted a crime scene analysis from a behavioral perspective and deduced therefrom the dynamics between the victim, the offender and the location of the incident. Following a N.J.R.E. 104 hearing, the trial judge excluded the evidence under N.J.R.E. 702 as lacking in scientific reliability. On the State's motion for reconsideration, the judge heard additional testimony from Safarik, explaining, among other things, that crime scene analysis was generally accepted in the law enforcement and forensic communities. The judge then ruled that Safarik could testify about the characteristics of the victim and the crime scene, but not the offender.
Accordingly, Safarik testified before the jury that the lack of defensive wounds on the victim indicated that she was not aware of the threat the offender posed. In the same vein, the expert concluded that Fowler probably was in the basement voluntarily given that entry into the house required passing through a very small gate, walking the length of a long pathway, and then entering a door at the end of that pathway. Fowler had no broken fingernails or debris under her fingernails, both signs that would indicate an effort to grab an object to avoid being taken someplace or an effort to defend herself.
Some of the expert's other opinions, however, went beyond the parameters permitted. For instance, Safarik said the evidence showed neither sex nor money to be a reason for the killing, which he opined was motivated instead by "an interpersonal aggression," and committed in a manner consistent with overkill. Safarik then explained why he thought that Fowler was manually strangled. In Safarik's view, whoever killed Fowler was very angry, because her killer struck her many more times with a blunt object than was necessary to kill her. Finally, the expert observed that a "weapon of opportunity" is one that "would be immediately accessible to the offender from the  his immediate vicinity or on his person."
Quite apart from the fact that a portion of the expert's testimony transgressed the permitted boundaries, none of it should have been admitted. Under N.J.R.E. 702, for expert proof to be admitted: 1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; 2) the field *926 testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and 3) the witness must have sufficient expertise to offer the intended testimony. Hisenaj v. Kuehner, 194 N.J. 6, 15, 942 A.2d 769 (2008); State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984). Under the second prong, behavioral science "should be evaluated under the test for admission of scientific evidence[,]" State v. Fortin, 162 N.J. 517, 525, 745 A.2d 509 (2000), namely, whether the technique or mode of analysis has sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth. State v. Cary, 49 N.J. 343, 352, 230 A.2d 384 (1967). Reliability of scientific evidence, in turn, may be demonstrated in a number of ways: 1) expert testimony as to the general acceptance of those in the profession of the premises on which the proffered expert based his or her analysis; 2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and 3) by judicial opinions that indicate the expert's premises have gained general acceptance. Kelly, supra, 97 N.J. at 210, 478 A.2d 364. As to the latter, no New Jersey case has ruled on the reliability of crime scene or behavioral analysis.
The present matter affords no better an opportunity for resolution of the issue. Simply stated, the record is far too sparse and undeveloped[3] to permit an informed de novo review, State v. Harvey, 151 N.J. 117, 166-67, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000); cf. Hisenaj, supra, 194 N.J. at 12-13, 942 A.2d 769, of whether the field of behavioral assessment and crime scene analysis is at a state of the art such that Safarik's testimony may be considered sufficiently reliable. Suffice it to say, the State has not borne its burden of demonstrating the scientific reliability of its expert proof. See Hisenaj, supra, 194 N.J. at 15, 942 A.2d 769.
There is yet another reason why Safarik's testimony was inadmissible. It fails to meet the threshold requirement under N.J.R.E. 702 that it be beyond the ken of the average juror, a finding the trial judge made with no analysis. On this score, the "opinion of a duly-qualified expert may be presented to a jury if it will genuinely assist the jury in comprehending the evidence and determining issues of fact[,]" State v. Odom, 116 N.J. 65, 70, 560 A.2d 1198 (1989), as where "it relate[s] to a relevant subject that is beyond the understanding of the average person of ordinary experience, education, and knowledge." Id. at 71, 560 A.2d 1198. "If the expert's testimony on such a subject would help the jury understand the evidence presented and determine the facts, it may be used as evidence." Ibid.
Here, Safarik was not testifying as to a subject matter peculiarly within his expertise or knowledge and unrecognizable or unfamiliar to the layperson, as, for instance, practices in an unknown sub-culture, such as the drug or gang subculture. See State v. Nesbitt, 185 N.J. 504, 515, 888 A.2d 472 (2006) ("We do not presume that ordinary members of the public ... are versed in the many ways in which a seller of crack cocaine can act in concert with others in the business of distributing drugs on the street"); State v. Torres, 183 N.J. 554, 579, 874 A.2d 1084 (2005) (finding that the organization and structure of gangs is a proper topic for expert testimony). *927 Quite the contrary, Safarik was simply testifying about logical conclusions the ordinary juror could draw from human behavior. For instance, his opinion that the victim knew her attacker and freely accompanied him to the abandoned house amounts to no more than common sense, since a jury could easily infer that one does not usually enter an abandoned building with a stranger unless it is against her will. Similarly obvious is that strangulation coupled with multiple blows to the face with a hammer demonstrates "overkill" committed by an extremely angry perpetrator. These, and others, were all logical inferences the average juror could draw from the facts of record without the need for expert guidance by one knowledgeable of, or experienced in, behavioral assessment.
That said, we are satisfied the admission of such evidence was harmless error. State v. Macon, 57 N.J. 325, 337-38, 273 A.2d 1 (1971). In the first place, the matters addressed by Safarik were supported by other competent evidence and witnesses. The county medical examiner testified that Fowler was manually strangled; that Fowler was hit repeatedly with a blunt object; and that Fowler had no defensive wounds. Other witnesses saw defendant in the company of Fowler only hours before the murder; one witness saw defendant bring a mattress into the Townsend Street house; another witness testified that defendant, only a short time before the murder, provided the address of an abandoned house on Townsend Street as his address; and various witnesses had observed defendant with a hammer similar to the one likely used in the murder.
In any event, none of Safarik's expert testimony opined on the ultimate question of defendant's guilt, see State v. Baskerville, 324 N.J.Super. 245, 246-47, 735 A.2d 39 (App.Div.1999), certif. denied, 163 N.J. 10, 746 A.2d 456 (2000), or really actually mattered, given the "ample independent testimony" that defendant killed Fowler. State v. Singleton, 326 N.J.Super. 351, 354, 741 A.2d 168 (App.Div.1999). As noted, defendant was tried twice previously without conviction. The obvious difference in the third trial was Dominguez, to whom defendant confessed. Given the logistics and the language barrier of the non-English speaking Cuban exile, Dominguez' testimony was reliable, because he could only have known of the details through defendant. Coupled with the other witnesses' testimony, there was ample evidence to convict defendant. Under the circumstances, we harbor no reasonable doubt that Safarik's testimony contributed to the verdict, Macon, supra, 57 N.J. at 337-38, 273 A.2d 1, and, consequently, find the admission of Safarik's testimony harmless error.

(III)
Defendant's remaining issues are without merit and deserve only brief mention. Contrary to defendant's contention, Kushner, the lead investigator in the case, did not impermissibly testify as to defendant's guilt or credibility. He simply responded to defense counsel's challenge that the State ignored other viable suspects and focused narrowly on the wrong man, his client. In explaining why defendant was pursued as the "main suspect," Kushner said defendant lied to investigators, at first denying knowing Fowler or having been in Lyles' house, but then admitting these facts. Nowhere, however, did Kushner opine as to defendant's guilt or even his general credibility. See State v. Frisby, 174 N.J. 583, 594-95, 811 A.2d 414 (2002). Indeed, the witness simply invoked the evidence of defendant's inconsistencies and implausibilities to explain why he was singled out amongst the others *928 as the prime suspect. Considering the defense's open invitation, see State v. Corsaro, 107 N.J. 339, 345, 526 A.2d 1046 (1987), we discern no error, much less plain error. State v. Hock, 54 N.J. 526, 257 A.2d 699 (1969), cert. denied sub nom. Hock v. New Jersey, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970).
Lastly, defendant points to several comments in the prosecutor's opening and closing statements that were improper. In our view, none of them deprived defendant of a fair trial.
Defendant first complains that the prosecutor twice asked for justice by rendering a guilty verdict, implying that defendant caused the nine-year delay and that only a conviction will serve justice. We disagree. No fair reading of the challenged remarks can be deemed to have blamed defendant for the delay. Moreover, the prosecutor asked for "justice [in the form of a conviction based on the evidence." We perceive nothing improper in equating "justice" with a verdict based on the record evidence.
Defendant next takes issue with the prosecutor's warning the jury about the State's imperfect proofs and argues that such a remark impermissibly bolsters the credibility of the State's witnesses. Again, we disagree. The prosecutor neither vouched for the credibility of his witnesses nor referred to evidence outside the record. Rather, he simply telegraphed discrepancies or inconsistencies in the various witnesses' accounts due to blurred memories over time, and to weaknesses in his case involving witnesses with criminal convictions or motives to implicate the defendant. There is nothing improper in doing so.
Defendant's final complaint is that the prosecutor willfully distorted the evidence, noting that Fowler's son Quadir had seen Fowler and defendant together 20, 30 or 40 times, when, in fact, Quadir testified that he saw them together only twice. We do not perceive this misstatement, however, to be so egregious as to have deprived defendant of a fair trial. The salient point was whether defendant knew the victim and, thus, most likely willingly entered the home with him. Quadir did testify that he had seen his mother in defendant's company, albeit only twice. Wilson and Lyles testified that Fowler had spent several hours in defendant's company the day before she was killed. Further, Rodriguez testified that he saw the victim on the night she was killed in the company of defendant, whom he knew. Warren testified that he was "pretty sure" that it was defendant he saw with the victim under the railroad bridge on the day the victim was killed. Other witnesses testified that, on Friday, they saw defendant enter the home with a black woman. Thus, there was ample evidence that the victim was acquainted with defendant. Furthermore, the judge clearly and expressly instructed the jury that it is their recollection of the facts that controls and that counsel's comments are not evidence. We presume, of course, that the jury faithfully followed the court's instructions. State v. Manley, 54 N.J. 259, 271, 255 A.2d 193 (1969).
Affirmed.
NOTES
[1] Dastas did not testify as such at defendant's two previous trials, supposedly because he thought the police "had" defendant and would "put him away," and that he would get himself in trouble. He also admitted that in 1997, he was facing a life sentence for aggravated sexual assault but received a seven-year sentence. He denied receiving any leniency in exchange for his 1997 testimony. At the time of this trial, he was back in prison for having violated Megan's Law. He had seven convictions in all.
[2] There is some indication that Dominguez heard "Townsend" as "thousand", and actually referred to the street as "1000 Street."
[3] Although it is clear that the State submitted articles and case law to the trial court, none of the articles were submitted on appeal, and the references to the case law in the trial transcripts are fleeting.