# Illinois Official Reports

## Appellate Court

---

### *People v. King*, 2018 IL App (2d) 151112

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHADWICK R. KING, Defendant-Appellant. |
| | |
| District & No. | Second District<br>Docket No. 2-15-1112 |
| | |
| Filed | August 21, 2018 |
| | |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 14-CF-1229; the Hon. James C. Hallock, Judge, presiding. |
| | |
| Judgment | Reversed and remanded. |
| | |
| Counsel on Appeal | Gabriel A. Fuentes and Clifford W. Berlow, of Jenner & Block LLP, of Chicago, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, David J. Robinson, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Jorgensen and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant, Shadwick R. King, appeals his conviction of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and sentence of 30 years' incarceration, following a jury trial in the circuit court of Kane County. Because defendant was prejudiced by the improper introduction of a former FBI profiler's "crime-scene-analysis" testimony, we reverse and remand for a new trial.

¶ 2                               I. BACKGROUND

¶ 3      The common law record, trial transcripts, photographs, and videos in evidence show the following. We will supplement the facts as necessary in the analysis section of the opinion.

¶ 4                      A. The Body on the Railroad Tracks

¶ 5      On July 6, 2014, between 6:02 and 6:05 a.m., an eastbound Union Pacific freight train passed through Geneva Station in Geneva, Illinois. Locomotive engineer Devin Satchell saw no one on or near the railroad tracks. The tracks were surrounded by heavy brush, although there were access points at breaks in the brush.

¶ 6      An eastbound Metra passenger train traveling on track 1 approached Geneva Station at 6:36 and left it at 6:37 a.m. The train was under the Route 25 overpass when student engineer Alex Perez informed engineer Robert Soto Jr. of a "body, or something" on track 2. Perez began blowing the train's horn. Soto saw a woman lying awkwardly on the track. She had a blank stare and was not moving.

¶ 7      At approximately 6:39 a.m., the train came to an emergency stop, and crew members Dan Mongelli and Joel Cavender stepped out to investigate. Cavender observed that the woman's shirt was halfway up her back and that she did not move or breathe. Mongelli saw the woman's shirt lift, and he informed his dispatcher, "I believe this broad's still breathing." However, when he got within a foot of the woman and squatted down to look at her, he saw that she was not breathing. He determined that her shirt had lifted in the breeze. Mongelli noticed that her neck was "laid" across the track "in a perfect manner" so that an oncoming train would strike it. He also noticed a purple color around her mouth, brush (described by another witness as dried leaves and a blade of grass) in her hair, a cell phone nearby, and "spotting" on her leg. This "spotting" was later determined by paramedic Gary Grandgeorge and deputy coroner Lisa Gilbert, who also responded to the scene, to be "lividity." Mongelli realized at the scene that the woman was deceased. Mongelli and Cavender waited for the police to arrive.

¶ 8      Geneva police sergeant George Carbray arrived on the scene at approximately 6:55 a.m. According to Carbray, the body was lying on its left side, facing west. The head and neck were positioned over the northern rail. A pink iPhone was placed against a couple of railroad spikes on the opposite side of the rail from the body. It would later be determined that there were no fingerprints on the phone.

¶ 9      The body was clad in a gray top, black running shorts with no spandex liner, and black and pink running shoes. The shorts were loose, and there were no underpants beneath them. A dried leaf was on the lower abdomen, just above the pubic area. A Maidenform underwire bra was pulled up, half exposing the breasts.

¶ 10    Carbray found no pulse. He believed that the woman had been dead for some time, but he wanted a medical opinion, so he called for paramedics. They attached a heart monitor to the body but found no heartbeat. Grandgeorge testified that the monitor detected "pulseless electrical activity," which can carry on "for some time" after a person dies. The paramedics did not make resuscitation efforts because it appeared that the woman had been deceased for "quite some time." EMT Michael Antenore noted that the woman's skin was a "cyanotic purple" color and that the pupils were "fixed and dilated." Antenore also noted that the paramedics had mud on their shoes, due to an overnight rain, but that the woman's running shoes were clean.

¶ 11    The woman was later identified as 32-year-old Army reservist Kathleen King, defendant's wife. Their home was located 1200 to 1300 feet from where she was found. People who were in the general area of the railroad tracks between 6 and 6:30 a.m. on July 6 did not see anyone running or see any cars in nearby Esping Park. Esping Park was just north of the tracks and had walking paths providing access to the tracks. Defendant's neighbors did not see him or his SUV out between 6 and 6:30 a.m.

¶ 12    Defendant's and Kathleen's 10-year-old son, Brandon, testified that Kathleen ran in Esping Park. According to Brandon, when running, Kathleen customarily wore an armband into which she tucked her iPhone. She also wore either glasses or contact lenses and earbuds. When her body was found, she was not wearing contacts or glasses. Her contacts, armband, and earbuds were found in her home during a later search.

¶ 13                                   B. The Fourth of July Party

¶ 14    At approximately 6 p.m. on July 5, 2014, Kathleen, defendant, and their three boys, then ages nine, seven, and five, arrived at the home of her father, Kurt Kuester, in Elk Grove Village for a Fourth of July celebration. During the evening, defendant drank three or four beers, and Kathleen drank a bottle and a half of wine. According to Kathleen's younger sister Kristine, Kathleen demonstrated a maneuver to render someone unconscious that she had learned in the Army. At about 10:30 or 10:45 p.m., Kathleen and defendant left the party. The boys stayed overnight with Kurt. According to Kristine, Kathleen did not have any injuries or bruises that night.

¶ 15    The next morning, Kristine learned from the Geneva police that Kathleen had died. At approximately 10:40 a.m. on July 6, Kristine telephoned Kurt and told him that Kathleen was dead. In a second phone call that morning, Kristine told Kurt not to allow defendant to have the boys.

¶ 16    Kurt testified that he frantically started screaming, "What are you talking about?" when Kristine broke the news to him of Kathleen's death. At about that time, defendant was approaching the front door, which Kurt thought was unusual, because defendant "never" picked up the children. Kurt asked defendant, "Where is Kathleen?" Defendant replied, "We were fighting and she went running at 6:30 to clear her head." Kurt told defendant: "Kathleen is dead, Shad." Defendant bent over and said: "I didn't do anything. I didn't do anything." According to Kurt, defendant did not ask what had happened to Kathleen or where she was.

¶ 17                                   C. Police Interviews of Defendant

¶ 18    Elk Grove Village police officers Angela Garza and Eric Perkins responded to a call at Kurt's residence on July 6 at 11:44 a.m. Defendant told Garza that Kurt would not allow him to

take his children because Kathleen was deceased. Defendant stated that he and Kathleen had an argument over her seeing a man whom she met in the military and that defendant told her to choose between the other man and him. Then, according to defendant, Kathleen went running by the river at 6:30 a.m. Defendant stated that he came to Kurt's home to pick up the children, but that no one was home, so he drove to Kathleen's grandmother's house in Chicago. He arrived between 9 and 9:30 a.m., but no one was there, so he drove back to Kurt's house. Defendant asked if Kathleen was okay. Garza and Perkins transported defendant to the Geneva police station. Garza testified that defendant was so upset and anxious that it was not safe for him to drive himself. According to Garza, 20 minutes into the ride, defendant asked how Kathleen had died, but the officers did not have those details.

¶ 19    At 1 p.m., Geneva police detectives Robert Pech and Brad Jerdee interviewed defendant. The video of the interview is in evidence. Defendant explained to the detectives that Kathleen was away in basic training from February 7 to June 14, 2014. Defendant took a leave of absence from his insurance job to take care of the children while Kathleen pursued her Army career. According to defendant, when Kathleen returned home, he learned of her relationship with a man he called "Keno," whom she met in the military. Defendant stated that he mentioned divorce but, he said, Kathleen refused to consider it. Defendant also stated that he agreed that Kathleen could move out of state with the children to be with Keno as long as she agreed that defendant could have the boys during the summer. Defendant further stated that he told Tim Casey, Kristine's fiancé, that he might miss their wedding because of marital problems.

¶ 20    Casey (Kristine's husband at the time of trial) confirmed what defendant said that he had told him. Casey also testified that he had helped cover up Kathleen's affair by lying to defendant about Kathleen's whereabouts on one occasion.

¶ 21    Defendant told Detectives Pech and Jerdee that he and Kathleen went to a bar in Geneva after they left Kurt's party the night of July 5. According to the bartender, she served defendant five bottles of Miller Lite and Kathleen four glasses of wine. A man named Chad joined the Kings and bought them each a shot. Chad testified that he did not see any bruises on Kathleen's face.

¶ 22    Defendant told the detectives that he and Kathleen left the bar at approximately 1:45 a.m. and got home at about 2 a.m. Defendant was brushing his teeth while Kathleen was texting someone on her iPhone. When Kathleen put the phone down where defendant would be sure to see the message she had written, he saw that she was sending a romantic text to Keno.

¶ 23    The record shows that the man's name was Billy Keogh. The record also shows that he and Kathleen had exchanged over 3000 text messages. In one message, Kathleen asked Keogh to marry her. Kristine was aware of her sister's relationship with Keogh and had helped Kathleen keep it from defendant.

¶ 24    Defendant told the detectives that, when he saw Kathleen's text to Keogh, he picked up her phone and texted Keogh to leave her alone. Defendant stated that he also texted Keogh that he was going to bed with Kathleen.

¶ 25    The record shows that 11 texts about defendant and Kathleen having sex were sent to Keogh from Kathleen's phone between 4:18 and 4:57 a.m. The record also shows that, after defendant took Kathleen's phone from her that morning, she used another device to communicate with Keogh.

¶ 26        According to defendant's statement to the detectives, he and Kathleen stayed up until 5 a.m. on July 6 talking about her desire to attend officers' school. Defendant denied that he and Kathleen argued about Keogh. Throughout the interview, defendant expressed that he accepted that his wife was having an affair. Defendant stated that he went to bed and slept for about an hour and that Kathleen was also in the bed. According to defendant, Kathleen went running at about 6:30 a.m. Defendant said that she usually ran by the river. Defendant stated that Kathleen was wearing black and pink running shoes but that he could not remember what else she was wearing.

¶ 27        At times during the interview, defendant was tearful. He ventured that Kathleen must have been hit by a car. One of the detectives told him that Kathleen's death was not accidental. Defendant repeatedly stated, sometimes indignantly, that he did not, and could not, have harmed her.

¶ 28        According to defendant, after Kathleen went running, he left the house to get donuts, as was his Sunday habit. At 9:30 a.m., he called and texted Kathleen to find out Kurt's phone number so that he could pick up the boys. Defendant stated that he left the house at about 9:30 a.m., waved to the neighbors, and went to Kurt's house. No one was home, so he drove to Kathleen's grandmother's home in Chicago. No one was there, so he drove back to Kurt's home.

¶ 29        One of the detectives asked defendant how he got a "fat" lip. Defendant rubbed the right side of his bottom lip but denied that his lip was "fat." At trial, Pech testified that defendant's right bottom lip was slightly swollen.

¶ 30        The detectives took defendant home, where he gave them permission to search and photograph his house. Pech described a messy house, with leaf fragments on the kitchen floor. Police again searched defendant's home on July 8, 2014, pursuant to a search warrant. Among the items collected was dried vegetation matter throughout the house and on a still-wet comforter that was in the washing machine. At trial, the State did not produce evidence forensically linking the vegetation found in the house and the vegetation that was found on Kathleen's body. During the search, police also found earbuds and an armband into which a phone could be inserted. Police also noted the presence of assorted sports bras.

¶ 31        On July 8, 2014, Pech and Jerdee conducted a second videotaped interview with defendant, this time after *Miranda* warnings. Pech informed defendant that Kathleen died of asphyxiation. Throughout the interview, the detectives presented defendant with various scenarios in which he accidentally killed Kathleen. Defendant repeatedly denied doing anything, or even being capable of harming Kathleen. Defendant denied knowing what happened to her. When Pech falsely informed defendant that his fingerprints were found on Kathleen's neck, defendant denied knowing how they got there. He suggested that he might have touched her.

¶ 32                              D. The Charge and Pretrial Motions

¶ 33        On July 11, 2014, the Kane County state's attorney charged defendant by information with two counts of first degree murder related to Kathleen's death. Following a preliminary hearing and a finding of probable cause, the case was assigned to Judge James C. Hallock. On September 15, 2014, the information was superseded by a two-count indictment for first degree murder.

¶ 34    On July 14, 2014, the State moved pursuant to a federal statute (18 U.S.C. § 2703(d) (2012)) for an order for the disclosure of registration records pertaining to defendant's and Kathleen's cell phones for July 5 and 6, 2014. Defendant made an oral motion, which the court denied, to declare the statute unconstitutional on the ground that the fourth amendment requires a warrant rather than a court order. On July 17, 2014, the court granted the State's motion to obtain the cell phone records.

¶ 35    On July 18, 2014, defendant moved for substitution of judge as of right (725 ILCS 5/114-5(a) (West 2014)). In a written order dated September 3, 2014, the court, identified only as "Judge 42," denied the motion on the ground that Judge Hallock had made a substantive ruling in denying defendant's motion to declare the federal statute unconstitutional, making the motion for substitution of judge untimely. The matter then remained in Judge Hallock's courtroom.

¶ 36    On January 15, 2015, the State filed its motion *in limine* No. 1, seeking leave to call Mark Safarik as an expert witness in crime scene analysis. The motion stated that Safarik was a "crime scene and behavioral analyst" for a private company known as Forensic Behavioral Services. The motion further stated that Safarik had 23 years' experience with the FBI, including as a supervisor with the Behavioral Analysis Unit (BAU). Safarik had been, in the vernacular, an FBI profiler. The substance of Safarik's proposed testimony was contained in a written report that he authored, which apparently was submitted separately to the trial court but is not in the record.

¶ 37    The record shows that Safarik worked as a police officer, handling violent crimes for seven years before joining the FBI. While in the FBI, Safarik attended training courses in various disciplines, including forensic pathology, death investigation, and criminal behavior.

¶ 38    The court granted the motion *in limine* over defendant's objection. In ruling that Safarik's testimony would be admissible if Safarik were qualified as an expert at trial, the court noted that Safarik's opinions would have to be rendered "pursuant to his qualifications" and that he would not be permitted to identify "the defendant as the killer by direct testimony." Nor, the court ruled, would Safarik be allowed to give profiling testimony. The court found that Safarik's "specialized knowledge" was "reliable" and "relevant" and that the general subject matter of his testimony would assist the jury to understand the evidence and to determine the facts. Specifically, the court found that the positioning of Kathleen's body on the railroad tracks was "a matter beyond the common experience of most jurors and is [a] subject of difficult comprehension."

¶ 39                                    E. The Trial

¶ 40    The jury trial commenced on March 2, 2015. In addition to the evidence detailed above, the following testimony was presented.

¶ 41                                1. Dr. Mitra Kalelkar

¶ 42    The State called forensic pathologist Dr. Mitra Kalelkar. Dr. Kalelkar performed an autopsy on Kathleen on July 7, 2014. Dr. Kalelkar noted the clothing on the body, as described above. Dr. Kalelkar also noted that the heel of one sock was twisted around the ankle and that one of the bra straps was twisted. Dr. Kalelkar testified to the presence of antemortem (before death), postmortem (after death), and perimortem (at the time of death) abrasions and bruises,

some of which were inconsistent with Kathleen having fallen or collapsed on the train tracks. Specifically, she testified that an antemortem bruise under the chin was consistent with someone's hands having been around Kathleen's neck or Kathleen having tried to pry someone's hands off her neck. Dr. Kalelkar opined that an antemortem bruise on the upper left arm was consistent with someone grabbing her. Dr. Kalelkar noted a red mark on the neck that did not contribute to Kathleen's death and a trail of saliva mixed with stomach contents on the cheek. According to Dr. Kalelkar, the stomach contained a minimal amount of brown fluid, and a toxicology report showed the presence of caffeine. At the time of the autopsy, Kathleen's blood alcohol concentration was 0.15.

¶ 43     Dr. Kalelkar filled in her autopsy protocol with "asphyxiation" as the cause of death. In her trial testimony, she expanded on that to include manual strangulation. She testified that she found petechial hemorrhages in the eyes and epiglottis mucosa[1] and that she also found focal hemorrhages at the base of the tongue. Those findings, she testified, indicate strangulation.

¶ 44                                         2. Mark Safarik

¶ 45     Safarik, a former police officer and FBI profiler with no medical training, testified, over objection, that the lividity on Kathleen's body was inconsistent with her having died on the train tracks. Over objection, Safarik testified to his opinion that the cause of death was manual strangulation. He enumerated possible causes of asphyxiation, reiterated the cause of death as listed by Dr. Kalelkar, and then eliminated all but manual strangulation as fitting the facts. Safarik opined, over objection, that the death scene on the tracks was staged, that Kathleen was killed in her residence, and that someone close to her, not a stranger, staged the scene. Safarik's testimony will be examined in more detail in the analysis section of the opinion.

¶ 46                                     3. Dr. Larry William Blum

¶ 47     Following the denial of his motion for a directed verdict, defendant presented his case. He called Dr. Blum, a forensic pathologist, who testified that Kathleen died of a cardiac event brought on by stress, alcohol intoxication,[2] lack of sleep, and caffeine consumption. Dr. Blum opined that Kathleen was running on the railroad tracks, became unwell, sat down on the rail, and expired. According to Dr. Blum, her bruises and lividity were consistent with that scenario. Dr. Blum acknowledged Dr. Kalelkar's findings of petechial hemorrhages in the eyes and focal hemorrhages at the base of the tongue, but he opined that those findings, standing alone, did not support a conclusion that Kathleen was manually strangled. Dr. Blum also testified that Dr. Kalelkar's autopsy report was incomplete because "asphyxiation" as a cause of death was nonspecific.

¶ 48     Defendant's testimony essentially mirrored the statements that he gave to the police.

¶ 49     In rebuttal, Dr. Kalelkar testified that her autopsy findings led her to conclude that Kathleen died of asphyxiation due to pressure applied to her neck. She testified that Dr. Blum's diagnosis of a cardiac event ignored evidence of strangulation. Kristine testified in rebuttal that her family's medical history could not account for Kathleen's premature demise.

---

[1] The epiglottis is cartilage that projects upward behind the tongue. Webster's Third New International Dictionary 763 (1993).

[2] Dr. Blum testified that Kathleen's blood alcohol concentration was 0.26 at its peak.

¶ 50 During the prosecution's rebuttal closing argument, the prosecutor argued that it was "okay" for the jurors to have questions about the evidence and "still convict the defendant."

¶ 51 The jury found defendant guilty of first degree murder, and, after denying his posttrial motion, the court sentenced defendant to 30 years' incarceration. This timely appeal followed.

¶ 52                                        II. ANALYSIS

¶ 53 Defendant raises six arguments: (1) the court erred in denying his motion for substitution of judge, (2) the court erred in admitting Safarik's testimony, (3) the court erred in permitting Kathleen's family to dwell on their suffering at her loss, (4) the prosecution improperly defined reasonable doubt in its closing argument, (5) defendant was not proved guilty beyond a reasonable doubt, and (6) the cumulative effect of the trial errors requires reversal.

¶ 54                          A. The Motion for Substitution of Judge

¶ 55 The day after the court granted the State's motion for disclosure of defendant's and Kathleen's cellular telephone records, defendant filed a motion for substitution of judge as of right, pursuant to section 114-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-5 (2014)). A defendant is entitled to an automatic substitution of his or her trial judge if he or she meets the following requirements: (1) the motion is made within 10 days after the case is assigned to the judge, (2) the motion names only one judge, unless the defendant is charged with a Class X felony, in which case he or she may name two judges, (3) the motion is in writing, and (4) the motion alleges that the judge is so prejudiced against the defendant that he or she cannot receive a fair trial. *People v. Tate*, 2016 IL App (1st) 140598, ¶ 13. Section 114-5 also provides for naming two judges where the offense charged may be punished by death or life imprisonment. 725 ILCS 5/114-5(a) (West 2014). Additionally, the motion must be made before the judge makes a substantive ruling. *Tate*, 2016 IL App (1st) 140598, ¶ 13. Where a motion for substitution of judge is improperly denied, all of the court's actions subsequent thereto are void. *People v. Klein*, 2015 IL App (3d) 130052, ¶ 79. We review *de novo* a ruling on a motion for substitution of judge as of right. *In re D.M.*, 395 Ill. App. 3d 972, 977 (2009).

¶ 56 Here, the question is whether Judge Hallock made a substantive ruling when he (1) denied defendant's motion to declare the federal statute granting access to cellular records unconstitutional and (2) granted the State's motion for access to those records. Defendant argues that Judge Hallock ruled merely on a discovery matter that was not substantive because it was collateral to the merits of the case. A ruling that does not go to the merits or relate to any issue of the crimes charged is not a substantive ruling. See *People v. Ehrler*, 114 Ill. App. 2d 171, 178-79 (1969).

¶ 57 The federal statute on required disclosure of customer communications or records provides that a court order for disclosure of electronic communications shall issue "only if" the governmental entity seeking such disclosure offers "specific and articulable facts" showing that there are "reasonable grounds" to believe that the contents of the records sought are "relevant and material" to an ongoing criminal investigation. 18 U.S.C. § 2703(d) (2012). In its motion, the State alleged the following facts to show "reasonable grounds": (1) Kathleen's cell phone was found near her body, (2) Kathleen was not murdered where her body was found, (3) defendant had been in possession of Kathleen's cell phone, (4) cadaver dogs alerted on the backseat of defendant's car, and (5) defendant at all times had his own cell phone with him.

The State argued that those facts supported its contention that the cell phone records were necessary to pinpoint the locations of defendant and Kathleen during the relevant time periods.

¶ 58    In considering whether the State presented "specific and articulable" facts supporting its request for the records, Judge Hallock necessarily considered aspects of the merits of the case. The State's motion was not a routine motion for "court-ordered discovery," pursuant to Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001), as defendant maintains, but was brought pursuant to a federal statute limiting the disclosure of electronic communications to situations in which reasonable cause is shown. That showing depends upon the underlying facts of the case.

¶ 59    Defendant also argues that Judge Hallock's constitutional ruling was not substantive because he ruled only on the procedural matter of whether a warrant, rather than a court order, was required. Defendant distinguishes *People v. Wilfong*, 17 Ill. 2d 373, 375 (1959), where a motion for substitution of judge was properly denied after the defendant unsuccessfully challenged the constitutionality of the statute under which he was indicted. Defendant in our case points out that he did not challenge the constitutionality of the statute under which he was charged, but brought a procedural challenge to the federal statute's method of disclosure of electronic communications.

¶ 60    At oral argument, we granted the State's motion for leave to cite *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206 (2018), in which the United States Supreme Court held that a warrant is required before a governmental entity can seize electronic communications pursuant to 18 U.S.C. § 2703(d). We are not persuaded of *Carpenter*'s relevance. Nevertheless, we believe that the ruling in our case was substantive. It went to the State's ability to acquire evidence to use in prosecuting defendant. Consequently, we hold that the court did not err in denying the motion for substitution of judge.

¶ 61                                    B. Reasonable Doubt

¶ 62    We next consider defendant's argument that he was not proved guilty beyond a reasonable doubt. Because we determine that defendant is entitled to a new trial based upon an evidentiary error, to prevent the risk of double jeopardy, we must also consider this argument. See *People v. Macon*, 396 Ill. App. 3d 451, 458 (2009). When a defendant challenges the sufficiency of the evidence, the reviewing court must determine whether, viewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 63    Defendant asserts that Dr. Kalelkar's testimony, contradicted as it was by Dr. Blum, was insufficient to prove that Kathleen's death was a homicide. The *corpus delicti* in a murder case consists of two essential elements: (1) the fact of death and (2) the fact that the death was caused by the criminal agency of some person. *People v. Jones*, 22 Ill. 2d 592, 595 (1961). Here, Dr. Kalelkar testified that Kathleen died as a result of asphyxiation due to manual strangulation. Dr. Blum disagreed, testifying that Kathleen's death resulted from a cardiac event, that is, natural causes. When confronted with a "battle of the experts" (see *People v. Smith*, 253 Ill. App. 3d 443, 446-47 (1993) (classic battle of the experts is different experts examining roughly the same information and arriving at opposite conclusions)), it is for the trier of fact to evaluate each expert's testimony and weigh its relative worth in context. *People v. Sims*, 374 Ill. App. 3d 231, 251 (2007).

¶ 64    Here, aside from contrasting the testimony of the two experts, defendant also maintains that Dr. Kalelkar did not complete her autopsy protocol with "any indication" of the cause of

death, calling it only "asphyxiation." That determination, defendant argues, is too equivocal to support a conclusion that the manner of death was homicide. Defendant relies on *People v. Ehlert*, 211 Ill. 2d 192 (2004), which also involved an opinion rendered by Dr. Kalelkar.

¶ 65    In *Ehlert*, the defendant was convicted of the first degree murder of her newborn child. *Ehlert*, 211 Ill. 2d at 194. The issue was whether the child was born alive. *Ehlert*, 211 Ill. 2d at 194. Dr. Kalelkar performed the autopsy, found no unusual cause of death, and later told a police officer that she could not tell for sure whether the baby was born alive. *Ehlert*, 211 Ill. 2d at 199. She left blank the space on the death certificate where she would normally fill in the manner of death and instructed the police to investigate further. *Ehlert*, 211 Ill. 2d at 199. After the police advised her of their investigation, which included witnesses' statements, she concluded that the baby had been born alive. *Ehlert*, 211 Ill. 2d at 199. Dr. Kalelkar then filled in the manner of death on the certificate as "homicide." *Ehlert*, 211 Ill. 2d at 208. At trial, however, Dr. Kalelkar testified that the manner of death could have been natural causes. *Ehlert*, 211 Ill. 2d at 209. The appellate court reversed the defendant's conviction, and our supreme court affirmed, holding that there was reasonable doubt as to the defendant's criminal agency. *Ehlert*, 211 Ill. 2d at 209-10.

¶ 66    *Ehlert* is inapposite. Here, contrary to defendant's contention, Dr. Kalelkar did not equivocate on the cause or manner of death. "Asphyxiation" certainly encompasses a killing (see Webster's Third New International Dictionary 130 (1993)), and at trial, relying on her autopsy findings, the doctor was clear and specific that Kathleen's neck had been compressed. Accordingly, we conclude that any rational trier of fact could have found that Kathleen's death was caused by some person's criminal agency. Consequently, we also hold that retrial is not barred by double jeopardy.

¶ 67                                                 C. Safarik's Testimony

¶ 68    As noted, the trial court granted the State's motion *in limine* No. 1, allowing Safarik's testimony over defendant's objection. We will not reverse a trial court's ruling on a motion *in limine* absent an abuse of discretion. *People v. Holman*, 257 Ill. App. 3d 1031, 1033 (1994). Also, the court made evidentiary rulings during Safarik's testimony. The admission of evidence is within the trial court's sound discretion and will not be reversed unless that discretion was clearly abused. *Snelson v. Kamm*, 204 Ill. 2d 1, 33 (2003).

¶ 69    Safarik testified that, as director of Behavioral Services International, he conducts "analyses and interpretations" of complex violent crime scenes and violent crimes to "understand essentially what happened in the crime, how it happened[,] and why the events unfolded the way that they did." Safarik testified that he also conducts "equivocal death evaluations" in cases where the "manner of death is not well established." According to Safarik, the Kane County State's Attorney's Office asked him to examine the evidence from the scene where Kathleen's body was found, to determine (1) whether the scene was staged, (2) the offender's risk level, (3) a general offender motive, and (4) the "behavioral manifestations at the scene," meaning the offender's *modus operandi*, ritual behavior, and staging behavior.

¶ 70    Safarik testified that he typically reviews crime reports, criminal investigation reports, crime scene photographs, autopsy protocols, autopsy photographs, diagrams and sketches of the crime scene, and witness statements. He also reviews any toxicology reports. If he needs the information, Safarik will ask to see the statements of witnesses who talked to the police

about the victim's habits. Safarik testified that he will also consider, as he did in the present case, an accused's statements, if they contribute to an understanding of the timeline of events leading up to a murder. In the present case, Safarik considered Brandon's statements as to where Kathleen usually ran and the app on her iPhone that recorded that she usually ran in Esping Park, but not near the railroad tracks.

¶ 71    From his review of the case, Safarik concluded the following: (1) Kathleen did not usually run on the railroad tracks; (2) defendant's statement to police that Kathleen left the house to go running at 6:30 a.m. was inconsistent with the lividity present on her body less than half an hour later, when the death scene photographs were taken, which indicated that she died prior to 6:30 a.m.; (3) the lividity on Kathleen's right leg was inconsistent with her position on the railroad tracks; (4) if she had been running, her shorts would have been tied and not loose; (5) the absence of an undergarment or a liner in Kathleen's running shorts was inconsistent with her being out for a run; (6) because Kathleen had "fairly large" breasts, running in an underwire bra would have been painful; (7) Kathleen had a large selection of sports bras, so she would not have been running in an underwire bra; (8) the presence of the underwire bra was inconsistent with defendant's statement that Kathleen possessed running gear; (9) Kathleen's twisted bra strap would have been "very uncomfortable" and was inconsistent with the way she would have put on the bra; (10) there was no sexual motive to the crime, because Kathleen's bra was covering half her breasts; (11) it was unlikely that Kathleen would have put on her left sock with the heel twisted toward the top of her foot; (12) a clump of hair in her right sock was inconsistent with the way a person would dress herself; (13) Kathleen was not wearing an armband, which was inconsistent with witnesses' statements that she wore one when running; (14) the absence of earbuds was inconsistent with witnesses' statements that Kathleen listened to music while running; (15) the leaf material on Kathleen's body was inconsistent with that in the area where the body was found; (16) Kathleen's iPhone was placed on the tracks by someone; (17) a trail of dried saliva mixed with blood running down Kathleen's cheek was inconsistent with the way her head was positioned on the tracks, indicating that she was on the tracks after the saliva had dried; (18) Kathleen was moved onto the tracks after she died in a different location; (19) Kathleen died as a result of manual strangulation; (20) a red mark on Kathleen's neck was consistent with hands having been around her neck; (21) a bruise under Kathleen's chin was consistent with someone having strangled her; (22) every form of asphyxiation except manual strangulation was ruled out; (23) Kathleen's injuries were inconsistent with a fall on the tracks; (24) scrapes on Kathleen's shins were postmortem because there was no blood; (25) Kathleen was incapacitated by alcohol and did not see the attack coming; (26) the attack came on very quickly; (27) strangers do not stage crime scenes; (28) a staged crime scene indicates that the killer was someone close to the victim; (29) the offender attempted to make Kathleen's death look like an accident; (30) the leaf material found on Kathleen's body was from her residence; and (31) based on the timeline defendant gave to the police, Kathleen was killed in her residence.

¶ 72    Defendant argues that Safarik was improperly allowed to give an opinion as to the cause of death in a close case where the cause and manner of death were contested by two well-qualified, board-certified, forensic pathologists. Defendant additionally contends that Safarik improperly opined on matters that were within the ken of the jurors when he testified that the death scene was staged. Defendant asserts that Safarik essentially gave the State's closing argument.

¶ 73    Expert testimony such as Safarik's falls under the general rubric of "crime scene analysis," which involves the "gathering and analysis of physical evidence." See *Simmons v. State*, 797 So. 2d 1134, 1151 (Ala. Crim. App. 1999). Here, the State also proffered Safarik as an expert in the cause and manner of death as well as the habits or characteristics of people who stage crime scenes. Profiling evidence usually involves a witness describing common practices, habits, or characteristics of a group of people. *People v. Vasser*, 331 Ill. App. 3d 675, 687 (2002). Thus, Safarik also proffered profiling evidence.

¶ 74    At oral argument, we asked the State what Safarik's area of expertise was. That question was perspicacious because the State could not readily answer it. Indeed, Safarik's opinions ranged from forensic pathology, to botany, to the sartorial. Under the guise of expert "crime scene analysis," Safarik basically offered his subjective opinion that the State's evidence was sufficient to convict defendant. As the State admitted at oral argument, the purpose of Safarik's testimony was to "plug the holes" in the State's case.

¶ 75    Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) provides that, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "Crime-scene analysis" testimony does not rest on scientific principles. *Simmons*, 797 So. 2d at 1151; *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). Rather, it is based on "specialized knowledge" and offers "subjective observations and comparisons based on the expert's training, skill, or experience." *Simmons*, 797 So. 2d at 1151. Therefore, such testimony is not subject to the test outlined in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *Simmons*, 797 So. 2d at 1151.

¶ 76    We first consider defendant's argument that Safarik was not competent to testify to Kathleen's cause of death. Defendant asserts that an expert's opinion cannot exceed the area of his or her expertise, relying on *People v. Perry*, 229 Ill. App. 3d 29 (1992). In *Perry*, the defendant was convicted of killing her infant son by lying on top of him and smothering him with a pillow. *Perry*, 229 Ill. App. 3d at 30-31. The appellate court reversed that conviction and remanded for a new trial where the State's pathologist opined that the child's death was not an accident because a sleeping mother would not roll on top of an active child without the child making its distress known. *Perry*, 229 Ill. App. 3d at 32. The court held that the pathologist's expertise did not extend to determining the ability of a sleeping mother to "feel" her child. *Perry*, 229 Ill. App. 3d at 33. While we agree that an expert cannot express an opinion on a subject beyond his or her qualifications (see *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 784 (2002) (mechanical engineer with 35 years' experience could not testify to the cause of a collision)), the question here is whether the cause of a person's death is the subject of only expert medical testimony or whether a lay person can so opine.

¶ 77    The rule in Illinois is that medical testimony is not necessary to prove the cause of death where the facts proved are such that every person of average intelligence would know from his or her own knowledge or experience that a wound was mortal. *Waller v. People*, 209 Ill. 284, 288 (1904); *People v. Davidson*, 82 Ill. App. 2d 245, 250 (1967). Thus, in *Davidson*, the coroner's testimony that the victim was dead, coupled with other testimony establishing a criminal agency causing her death, was sufficient to sustain the murder verdict, notwithstanding the lack of medical testimony as to the cause of death. *Davidson*, 82 Ill. App. 2d at 250. In *Jones*, a *corpus delicti* case (*supra* ¶ 63), the evidence of the cause of death was

sufficient without medical testimony where the evidence showed that the defendant shot the victim, the victim fell and was found lying in a pool of blood, and the victim was immediately removed to a mortuary. *Jones*, 22 Ill. 2d at 597.

¶ 78    Here, medical evidence of the cause of Kathleen's death was necessary because a lay person of average intelligence would not know what killed her. She was found lying on the railroad tracks, not breathing or moving. There were no gunshot wounds or stab wounds. The body was warm, and there was no immediate evidence of foul play. Consequently, Safarik—no matter how many crime scenes he had attended as a police officer, how much study he had done on violent crime scenes as an FBI profiler, or how many courses he had attended—was not qualified by knowledge, skill, experience, training, or education to opine on the cause and manner of Kathleen's death. See *Snelson*, 204 Ill. 2d at 24 (expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education to render an opinion).

¶ 79    For the court to allow Safarik to opine that Kathleen died of manual strangulation was especially egregious where defendant disputed Dr. Kalelkar's conclusion as to Kathleen's cause of death and presented his own equally well-qualified forensic pathologist to testify that she died of natural causes. Through Safarik's inadmissible testimony, the State essentially "broke the tie" by presenting a second opinion to corroborate Dr. Kalelkar's. We hold that Safarik's opinion as to the cause of death was so highly prejudicial that we must reverse defendant's conviction.

¶ 80    We also note that it was beyond Safarik's expertise to opine on the effects of lividity. As a veteran of violent crime scene investigations, Safarik could doubtless identify the presence of lividity. However, whether it was consistent or inconsistent with the position of Kathleen's body on the railroad tracks was appropriate testimony for a forensic pathologist, as lividity correlates to the cause and manner of death. See *People v. Legore*, 2013 IL App (2d) 111038, ¶ 6 (forensic pathologist pinpointed time of death in part by analyzing lividity on victim's body).

¶ 81    In the same vein, Safarik should not have been permitted to testify that the vegetation on Kathleen's body came from her home because such an opinion was beyond his expertise and the State presented no evidence of such a correlation. To be admissible, an expert's opinion must have an evidentiary basis, or else it is nothing more than conjecture and guess. *City of Chicago v. Concordia Evangelical Lutheran Church*, 2016 IL App (1st) 151864, ¶ 72.

¶ 82    Next, we consider defendant's contention that the remainder of Safarik's testimony was prejudicial because it consisted of conclusions that the jurors could draw for themselves. A requirement of expert testimony is that it will assist the trier of fact in understanding the evidence. *Snelson*, 204 Ill. 2d at 24. Expert testimony addressing matters of common knowledge is not admissible unless the subject matter is difficult to understand and explain. *People v. Lerma*, 2016 IL 118496, ¶ 23. Evidence is beyond the ken of the average juror when it involves knowledge or experience that the juror lacks. *People v. Mertz*, 218 Ill. 2d 1, 72 (2005). Here, Safarik testified to conclusions that the ordinary juror could draw: an experienced runner would not have dressed in the garments in which the body was found; Kathleen would not have left her contacts, earbuds, and armband at home when she went running; she would not have been running on the railroad tracks when her habit was to run in the park; and she would not have put on a sock with the heel twisted to the top of her foot. We agree with the Superior Court of New Jersey's conclusion in *State v. Lenin*, 967 A.2d 915, 925

(N.J. Super. Ct. App. Div. 2009), that none of this type of testimony should have been admitted.

¶ 83   In *Lenin,* the court held that Safarik's testimony about the "characteristics of the victim and the crime scene" was inadmissible because he was "simply testifying about logical conclusions the ordinary juror could draw from human behavior." *Lenin*, 967 A.2d at 927. The court also held that behavioral-science testimony, such as Safarik's, must be evaluated under the test for admission of scientific evidence. *Lenin*, 967 A.2d at 926. We disagree with the latter holding because, as discussed, we believe that the better view is that crime-scene-analysis testimony is not scientific. See *Simmons*, 797 So. 2d at 1151.

¶ 84   Further, in our case, Safarik ventured beyond "crime scene analysis" into profiling when he testified to the characteristics of persons who stage crime scenes. Profiler testimony has been excluded by other states' supreme courts as unreliable. *Mertz*, 218 Ill. 2d at 72-73. In *Mertz*, our supreme court declined to opine on the admissibility of such evidence, holding that any error in admitting a profiler's testimony comparing three distinct crime scenes, with a view as to whether they could be connected, was harmless because police officers had testified to the similarities that they had observed. *Mertz*, 218 Ill. 2d at 73-74. The court emphasized that the profiler did not explicitly opine that the defendant committed the uncharged offenses that the profiler had studied. *Mertz*, 218 Ill. 2d at 72.

¶ 85   Here, in testifying that a staged scene indicates that the killer is someone close to the victim, Safarik indirectly, but pointedly, identified defendant as Kathleen's killer because, under the circumstances, no one else fit that profile. Our case is more like *People v. Brown*, 232 Ill. App. 3d 885 (1992), than *Mertz*. In *Brown*, the First District held that the defendant, who was charged with possession of a controlled substance with intent to deliver, was prejudiced by profiling testimony regarding the violent habits of drug sellers. *Brown*, 232 Ill. App. 3d at 898. The court noted that the testimony "consisted of a complete profile of a drug dealer which corresponded to the circumstances surrounding [the] defendant's arrest." *Brown*, 232 Ill. App. 3d at 899-900.

¶ 86   Trial courts are obliged to balance the probative value of expert testimony against its prejudicial effect. *Lerma*, 2016 IL 118496, ¶ 23. Here, the court performed this analysis in ruling on the State's motion *in limine* No. 1, as it precluded Safarik from directly identifying defendant as the killer or giving profiling testimony. Yet, at trial, Safarik was permitted to say indirectly what he could not say directly. We follow *Brown* and hold that such profiling evidence is inadmissible.

¶ 87   The State argues that the admission of Safarik's testimony was harmless error because (1) he drew conclusions that the jurors could have drawn on their own and (2) his testimony was cumulative. In *Mertz*, the court held that the admission of profiling testimony was harmless because "any inferences drawn by [the profiler] were commonsense ones that the jurors no doubt had already drawn for themselves." *Mertz*, 218 Ill. 2d at 74. That reasoning does not apply in our case, where one of the claimed errors is that Safarik's testimony was inadmissible precisely because it was within the knowledge of the average juror. Ironically, the court's discussion in *Mertz* supports defendant's argument.

¶ 88   We also reject the argument that Safarik's testimony was cumulative. While Dr. Kalelkar opined that Kathleen died of manual strangulation and also opined on the staging of the death scene, her testimony was undermined by the fact that she did not complete her autopsy

- 14 -

protocol. As the State forthrightly conceded at oral argument, Safarik's testimony was designed to "plug the holes."

¶ 89   Also, unlike in *Brown*, where the error was found to be harmless, the evidence of guilt in the present case was not overwhelming. Dr. Blum questioned Dr. Kalelkar's methodology and conclusions. There was no eyewitness, no confession, and no forensic evidence connecting defendant to the crime. Consequently, we hold that it was prejudicial error to grant the State's motion *in limine* No. 1 and to permit the testimony at defendant's trial.

¶ 90   On retrial, the arguments that defendant raises concerning evidence of Kathleen's family's suffering and the State's rebuttal closing argument are likely to arise, so we briefly address them.

¶ 91   Kristine testified that she was close to Kathleen (that Kathleen was like her mother) and that Kathleen had shopped for Kristine's wedding gown. Kristine described how upset she was when she was told of Kathleen's death and that she was pacing and crying. Kurt testified that he was frantic and screaming when he heard the news of Kathleen's death. The court overruled defendant's objections to this testimony. While some reference to the victim's family is proper and inevitable (*People v. Campos*, 227 Ill. App. 3d 434, 449 (1992)), evidence that dwells on the victim's family is unduly prejudicial. *People v. Bernette*, 30 Ill. 2d 359, 371 (1964). Here, the evidence of the family's emotional attachments and reactions went beyond anything that was relevant and was introduced solely for its emotional impact. On retrial, such testimony is inadmissible.

¶ 92   In his rebuttal closing argument, the prosecutor told the jurors that it was "okay" for them to have "questions" about the evidence and still convict defendant. The prosecutor gave an example of a permissible question dealing with what point of access defendant took to get the body onto the railroad tracks. He then reiterated that the jurors could have questions, "as long as those questions don't amount to a reasonable doubt." This argument was an improper attempt to define and dilute the State's burden of proof (see *People v. Evans*, 2016 IL App (3d) 140120, ¶ 59 (prosecutor's rebuttal remarks improperly conflated the beyond-a-reasonable-doubt standard with a question of whether the defendant's actions were reasonable, lessening the State's burden of proof)), and nothing close to it is permitted on retrial. It is well established in Illinois that "reasonable doubt" needs no definition. *People v. Amos*, 46 Ill. App. 3d 899, 902 (1977).

¶ 93                          III. CONCLUSION

¶ 94   For the foregoing reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded for a new trial.

¶ 95   Reversed and remanded.